[Cite as *State v. Cox*, 2014-Ohio-2201.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 25907 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2012-CR-3110 |
| v. | : | |
| | : | |
| GEORGIA B. COX | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 23rd day of May, 2014.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by KIRSTEN A. BRANDT, Atty. Reg. #0070162, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

ANTHONY S. VANNOY, Atty. Reg. #0067052, 130 West Second Street, Suite 1624, Dayton, Ohio 45402
and
      Attorney for Defendant-Appellant
ROBERT ALAN BRENNER, Atty. Reg. #0067714, 120 West Second Street, Suite 706, Dayton, Ohio 45402.
      Substitute Attorney for Attorney Anthony S. VanNoy at oral argument only
. . . . . . . . . . . .

FAIN, J.

    **{¶ 1}**    Defendant-appellant Georgia B. Cox appeals from her conviction and sentence

for Assault, in violation of R.C. 2903.13(A), (C)(2), a felony of the fourth degree. Cox contends that the jury's finding that she struck the victim in his upper right chest, in the area of his shoulder, attempting thereby to cause him physical harm, is both against the manifest weight of the evidence and not supported by the evidence. She further contends that the jury's finding that she had assumed, either voluntarily or by contract, the duty to provide for the care and protection of the victim, a functionally impaired person, is not supported by the evidence. Cox also contends that the trial court abused its discretion by admitting, over her objection, a surveillance video depicting the alleged offense. Finally, Cox contends that the trial court abused its discretion by permitting, over her objection, the State to refer to the Licensure Code of Professional Conduct for Ohio Educators while cross-examining her, and by overruling her motion for a new trial based upon the State's use of the Code during her cross-examination.

{¶ 2}   We conclude that the evidence in the record permitted the jury reasonably to find that Cox hit the victim's upper right chest, in the area of his shoulder, and the jury could reasonably infer that she intended to cause the victim physical harm in the form of pain. This finding is also not against the manifest weight of the evidence. The evidence in the record also permitted the jury reasonably to find that Cox had assumed, voluntarily or by contract, the duty to provide for the care and protection of the victim, a functionally impaired person. We also conclude that the trial court did not abuse its discretion by admitting in evidence, over Cox's objection, a surveillance video showing the alleged offense. Although the video is of poor quality, an eyewitness vouched for its accuracy, and it had value in assisting the jury in understanding the testimony of the witnesses. Finally, we conclude that the trial court did not abuse its discretion in: (1) overruling Cox's objection to the State's use of the Licensure Code of

Professional Conduct for Ohio Educators in cross-examining the defendant, and (2) overruling Cox's motion for a new trial based upon the State's use of the Code to cross-examine Cox. Although the State did not bring to Cox's attention, or to the trial court's attention, its intent to use the Code in its cross-examination of Cox until a recess between Cox's direct examination and her cross-examination, the Code had not been brought to the State's attention, by a bystander at the trial, until that recess. The trial court did allow defense counsel a few minutes to review the part of the Code to which the State intended to refer.

{¶ 3} Accordingly, the judgment of the trial court is Affirmed.

## I. In the Span of Forty Seconds, During a School's Morning Routine, Cox's Lapse in Judgment Leads to her Conviction for a Felony

{¶ 4} Cox was a highly qualified teacher with several years experience teaching in the Dayton School District, and had qualified as an Intervention Specialist, when she began serving as an Intervention Specialist at Meadowdale High School in 2012. She had two Master's Degrees.

{¶ 5} Cox had trained in Crisis Prevention Intervention at a program in Minnesota. The program generally covered techniques for de-escalating confrontations, and included specific training in techniques for obtaining release from various types of grabs.

{¶ 6} Cox was responsible for providing instruction to eight students with multiple disabilities. On the morning of October 10, 2012, Cox had five of her students in attendance. There were three other Intervention Specialists on staff at Meadowdale, each assigned up to eight students.

{¶ 7} In accordance with the usual routine, the students with disabilities waited on the bus until the general education students (those without disabilities) were finished breakfasting in the Cafetorium, a facility at Meadowdale that doubled as a cafeteria and an auditorium, with the physical features of each. Then the students with disabilities were brought into the Cafetorium, where they received a federally funded breakfast. During the first class period, most of the students with disabilities would eat their breakfasts and socialize in the Cafetorium. One Intervention Specialist handled her students differently; they would go to their self-contained classroom during first period. Each Intervention Specialist had a self-contained classroom, meaning that most instruction would take place in the one classroom, although the students would occasionally go to other rooms for special classes.

{¶ 8} K. W., the alleged victim in this case, was a 16-year-old with multiple disabilities who had a diagnosis of cerebral palsy. He was partially paralyzed on his left side, and did not use his left hand much. In fact, part of his physical therapy consisted of reminders and exhortations to use his left hand and arm; but he did not ordinarily do so. K.W. used a wheelchair, and when he was not being assisted, used his right arm to move both the left and right wheels, in alternation. K.W. also had a limited ability to speak, although he understood when others spoke to him. Several witnesses testified to the fact that K.W. craved attention, and would reach, grab, and even strike (although not maliciously) in an attempt to gain another's attention.

{¶ 9} K. W. was not one of Cox's students. In fact, she testified that she did not know him by name on the morning of October 10, 2012.

{¶ 10} Cox and two other Intervention Specialists had two paraprofessionals, or "paras," generally assigned to work with the students with disabilities; the fourth Intervention Specialist

had one paraprofessional. The role of the paraprofessionals was not to assist in instruction, but to assist the students with disabilities in other ways to do things the students could not easily do for themselves. This assistance might include helping the students eat, use the bathroom, and move around, for example.

{¶ 11} As was her custom, Cox did not immediately join the students in the Cafetorium, but later went down to see how things were going, and to begin instructing her students, in the Cafetorium, once they were done eating breakfast and ready to receive instruction. Some time before 8:40, Cox saw that her students were ready; she intended to assemble them at one table where two of them were already located.

{¶ 12} One of Cox's students required a semi-reclining wheelchair. This student had to be wheeled to the table Cox had chosen. As a paraprofessional was wheeling this student towards the table, Cox became aware that K.W.'s wheelchair would need to be moved slightly to the side to make room for her student to pass by. Cox did this, and then stepped to the side, in front of K.W., and facing him.

{¶ 13} Because Cox had not appeared to be paying any attention to him, K.W. began seeking her attention. Here, the testimony offered by the State and by Cox begins to diverge. Cox testified that K.W. grabbed her left wrist with his left hand and would not let go. She testified that she could not remove her wrist from K.W.'s grip. She attempted to persuade him to let go, without success. Cox then anticipated that K.W. was going to hit her. She raised her right arm, and told him: "Now, you can turn me loose. Don't hit me. If you hit me, I'm going to hit you back. Don't hit me."

{¶ 14} According to Cox, she never hit K.W., but did hit herself, in the area of her left

wrist, in an unsuccessful attempt to free herself from K.W.'s left-hand grip. Just a few seconds later, Cox again raised her right arm. According to her, she then said to K.W., "I'm not your teacher. I'm not Ms. Gross. If you hit me, I'm going to hit you back." Once again, Cox hit her own wrist, and once again, she was not able to free herself from K.W.'s left-hand grip. Another student then came over and touched K.W. He turned to see the student, and let go of Cox, who then walked away.

{¶ 15} Rebecca Burch, another Intervention Specialist who was sitting not more than fifteen feet away from, and facing, Cox and K.W., testified that she first focused on Cox and K.W. when she heard Cox say, "I'm not Ms. Gross. You hit me, I hit back." According to Burch, neither at that time, nor at any time thereafter, did K.W. have hold of Cox.

{¶ 16} Burch testified that she saw Cox raise her fist as she made the remark, and when K.W. struck out at her, Cox hit him. According to Burch, this was the first exchange, after which K.W. again hit Cox, and Cox hit him back. She testified that she could hear the impact of Cox's blow over the background noise in the Cafetorium.

{¶ 17} Susan Thrash, a paraprofessional, was sitting across from Burch, with her back turned to Cox and K.W. Although she did not see the interaction between them, she heard Cox tell K.W., "If you hit me, I will hit you back. I'm not Ms. Gross," and also heard a "smack." After some discussion between Thrash and Burch, it was determined that Burch would report the incident to the school principal.

{¶ 18} Patricia Group, the school nurse, did an injury assessment at 11:20 a.m. She found no evidence of injury to K.W., and no indication of pain when she palpated his right upper chest. When the nurse asked K.W. if he hurt anyplace, he shook his head to give a negative

response, but no effort was made to ask K.W. if he experienced pain during the incident, or otherwise to interrogate K.W. concerning the incident.

## II. The Course of Proceedings

{¶ 19} Cox was charged by indictment with Assault, in violation of R.C. 2903.13(A), (C)(2), a felony of the fourth degree.

{¶ 20} Before trial, Cox unsuccessfully sought a liminal ruling that a surveillance video depicting the incident could not be admitted in evidence. Cox appropriately renewed her objection to the video when the State used it at trial. Cox then used it herself during her testimony.

{¶ 21} Cox moved for a judgment of acquittal, under Crim.R. 29, both after the State rested its case, and after the conclusion of all the evidence. In support of both motions, she argued that the State had failed to prove that she was in the relationship of caretaker, as defined in R.C. 2903.10(B), to K.W. at the time of the alleged offense. She also advanced a second argument, that her use of force was permitted under R.C. 3319.41, which is not pertinent to this appeal. Both motions were overruled.

{¶ 22} The jury found Cox guilty as charged. She was sentenced to community control sanctions. From her conviction and sentence, Cox appeals.

## III. The Jury's Finding that Cox Caused, or Attempted to Cause,

## Physical Harm Is Supported by Sufficient Evidence,

## and Is Not Against the Manifest Weight of the Evidence

{¶ 23}   Cox's First and Second Assignments of Error are as follows:

THE CONVICTION IS BASED ON INSUFFICIENT EVIDENCE.

THE CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE

EVIDENCE.

{¶ 24}   Cox argues that the evidence in the record is insufficient to support a finding that she caused, or attempted to cause, harm to K.W.   In the alternative, she argues that the jury's finding to that effect is against the manifest weight of the evidence.

{¶ 25}   In support of this argument, Cox argues that her testimony that she did not hit K.W. is more credible than Burch's testimony that she did.   We conclude that the jury could reasonably conclude otherwise.   Besides generally having concluded that Burch was the more credible witness, the jury may have considered it unlikely that K.W. had a left-handed grip of Cox's left wrist from which she was unable to break free, in view of the testimony of K.W.'s mother and other witnesses that he was partially paralyzed on his left side and seldom used his left arm.   K.W.'s mother testified that he could not open and close his left hand.

{¶ 26}   Cox also argues that there was no evidence that she caused, or attempted to cause, physical harm, even if she did hit K.W.   We conclude that the evidence in the record permits a reasonable inference that Cox at least attempted to cause physical harm, which can be in the form of pain.   *State v. Hill*, 2d Dist. Montgomery No. 20678, 2005-Ohio-3701, ¶ 34. Both Burch and Thrash heard the noise of the impact of the blow over the background noise in the Cafetorium.   The State argues that the surveillance video also shows that K.W.'s wheelchair moved back with each blow.   We have watched the video, and the wheelchair does seem to move back slightly with the first blow.   We do not see comparable movement corresponding to

the second blow, although there is similar movement just preceding the second blow . Nevertheless, we conclude that the evidence in the record does support a reasonable inference that Cox intended to cause pain to K.W. with each blow of her upraised fist, striking down upon K.W. seated in his wheelchair.

**IV. There Is Evidence in the Record to Support the Jury's Finding that Cox Was a Caretaker of K.W., a Functionally Impaired Person**

{¶ 27} In support of her First Assignment of Error, Cox argues that there is insufficient evidence in the record to support a finding that she was a caretaker of K.W., for purposes of R.C. 2903.13(A), (C)(2). There is no dispute that K.W. is a functionally impaired person.

{¶ 28} R.C. 2903.10(B) defines a caretaker:

"Caretaker" means a person who assumes the duty to provide for the care and protection of a functionally impaired person on a voluntary basis, by contract, through receipt of payment for care and protection, as a result of a family relationship, or by order of a court of competent jurisdiction. "Caretaker" does not include a person who owns, operates, or administers, or who is an agent or employee of, a care facility, as defined in section 2903.33 of the Revised Code.

{¶ 29} Cox does not argue that the exception set forth in the second sentence of R.C. 2903.10(B) applies in this case. She argues that she was not K.W.'s caretaker, because Ohio Admin. Code 3301-51-09(I)(2) provides:

An intervention specialist shall serve no more than eight children with multiple disabilities.

(i) No more than eight children shall be served during any one instructional period.

* * *

{¶ 30}   Because K.W. was not one of the eight students with multiple disabilities on her "roster," Cox argues that she had no duty for his care and protection.   We disagree.

{¶ 31}   As Cox herself testified, the primary role of an intervention specialist is to provide for the educational needs of students with disabilities.   Paraprofessionals are assigned to minister to the students with disabilities' other needs while receiving education.   Thus, Ohio Admin. Code 3301-51-09(G)(2) requires that:

The school district shall assign early childhood, and school-age intervention specialists, or related service specialists to meet the unique *educational* needs of each child with a disability.   The school-age service provider may provide indirect or direct services in one or any combination of instructional groupings, including large group, small group, individual instruction, or parent and teacher training and consultation.   (Emphasis added.)

{¶ 32}   Consistently with the above-quoted regulation, Thrash testified that classes with the students who had disabilities were sometimes combined.

{¶ 33}   We conclude that the limitation of the number of students with multiple disabilities that can be assigned to one intervention specialist is addressed to the provision of the students' educational needs.   But Cox herself admitted that her responsibilities at Meadowdale were not strictly limited to providing instruction.   She admitted, for example, that she might have to feed a student who had a disability, or assist a student with a disability in using a

bathroom, if there was no one else available to do so.

{¶ 34}   More importantly, Cox admitted that her responsibilities at Meadowdale were not always restricted to the students with disabilities assigned to her for instructional purposes:

Q.  Okay.  Now, there's a difference between, I believe, what we're talking about.   I'm not asking you if you're responsible for instruction or teaching of every student in the school.   I understand you are responsible for the instruction and teaching of the students on your roster, correct?

A.   That's correct.

Q.   I'm talking about care and safety of all the students in the school. Are you telling the jurors that you are only responsible for the care and safety of the students on your roster and none of the other students in the school are your responsibility?

A.   In a very general sense, no, I'm responsible for all students.

Q.   Okay.

A.    However, I happen to be an intervention specialist, a special ed (phonetic)[1] person.

Q.   Right.

A.   And so in my regular duties, what I signed a contract for, when I was talking about what I'm responsible for, during a time for instruction, which is what my first period was, I am responsible for eight students.   That was a period of instruction.

---

[1]  "(phonetic)" appears in the transcript.

Q. Okay. And that what – who you are responsible to instruct, your eight students?

A. Correct.

Q. Okay. But you just told us that in a general sense, you are responsible for the care and safety of all of the students. Didn't you just testify to that?

A. Yes.

{¶ 35} Cox then admitted that she would have, and did have, responsibility for K.W.'s care and safety while voluntarily interacting with him:

Q. Okay. Now are you trying to tell this jury that when you decided to take it upon yourself to move [K.W.'s] wheelchair out of the way, that you were not responsible if something happened during the time you were moving that child?

A. No, I didn't say that. If something happened when I was moving him, I would be responsible.

Q. Okay. Okay. And once you started that interaction with him and moved him and stood right next to him, and an interaction started between the two of you, are you saying that with direct interaction with [K.W.], you were not a person who was responsible for his care and safety when you were in direct interaction with him?

A. I would say I was.

{¶ 36} Later, Cox distinguished her situation when moving K.W.'s wheelchair from her situation during her subsequent interaction with him by noting that her subsequent interaction

was involuntary: "[K.W.] was interacting with me." On re-direct examination, Cox expanded on this distinction:

Q. * * *

Prosecuting attorney asked you about, might there be circumstances where you might, because a paraprofessional was not present or certain situations where you might be required to voluntarily assume the care and protection of a student, correct?

A. Yes.

Q. Yes?

A. Yes.

Q. And there might be those occasions where you would voluntarily assume to do that, right?

A. Yes.

Q. On this occasion, after you had let go of his wheelchair and walked away, from that point on, had you voluntarily assumed his care and protection? After you left his wheelchair?

A. No.

Q. Because I think you had testified that had something happened while you were moving the wheelchair, you would take responsibility for that?

A. Yeah, while I was moving it.

Q. This didn't happen while you were moving the wheelchair; did it?

A. No.

{¶ 37} In closing argument, Cox argued that after she had moved K.W.'s wheelchair to facilitate her student being moved through, she no longer voluntarily interacted with K.W., but was actually trying to disengage from him after he had grabbed her wrist. But as noted in Part III, above, Burch testified that K.W. did not have hold of Cox, and the jury could reasonably have chosen to credit Burch's testimony on this point, not Cox's. Unless Cox had been grabbed and had not been able to break free, her interaction with K.W. was voluntary, even after he hit her to seek her attention, because she could have simply walked away, as she later did.

{¶ 38} Burch, herself an Intervention Specialist, and John Guhde, a curriculum specialist for Dayton Public Schools, both testified that the duty to provide for the care and protection of students with disabilities is not limited to those students assigned to an Intervention Specialist. They also both testified that an Intervention Specialist in the presence of a student with disabilities who is acting out would have a duty to de-escalate the situation, and that telling the student, "if you hit me, I am going to hit you back," is escalating, not de-escalating, the conflict.

{¶ 39} We conclude that there is evidence in the record from which the jury could reasonably have found that Cox had assumed a duty to provide for K.W.'s care and protection, under her contract with Dayton Public Schools, by reason of her having voluntarily interacted with K.W., or both.

{¶ 40} Cox's First and Second Assignments of Error are overruled.

## V. The Trial Court Did Not Err in Admitting the Surveillance Video in Evidence

{¶ 41} Cox's Third Assignment of Error is as follows:

THE TRIAL COURT ERRED BY ALLOWING THE SURVEILLANCE VIDEO INTO EVIDENCE.

{¶ 42} Cox moved in limine to exclude the surveillance video under Evid.R. 403(A): "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Cox argues that the admission of the video created a danger of misleading the jury, because its poor quality, with no audio, allowed "viewers to speculate on what is taking place, instead of showing them what actually happened."

{¶ 43} We have watched the video a number of times, at various speeds, and we agree that it is of the typical low quality associated with surveillance cameras. But Burch, an eyewitness to the events depicted in the video, testified that it accurately depicted those events, and the jury was not forced to rely solely on the video in determining what occurred. Both Burch and Cox testified concerning what happened in the Cafetorium that morning.

{¶ 44} The jury could look at the video and decide for themselves what weight to give it. The video assisted the jury in visualizing the testimony of the eyewitnesses Burch and Cox. It was also useful in determining to what extent the eyewitnesses' conflicting testimony was consistent with what could be observed in the video. We note, for example, that viewing the video persuades us that it is unlikely, if not impossible, that K.W. grabbed Cox's left wrist with his left hand, as Cox testified.

{¶ 45} We conclude that the trial court acted well within its discretion when it determined that the probative value of the video was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury. Cox's Third Assignment of Error is overruled.

## VI. The Trial Court Did Not Err in Allowing the State To Use the Licensure Code of Professional Conduct for Ohio Educators in its Cross-Examination of Cox

{¶ 46}   Cox's Fourth and Fifth Assignments of Error are as follows:

THE TRIAL COURT ERRED BY ALLOWING THE STATE TO CROSS EXAMINE THE DEFENDANT WITH THE LICENSURE CODE OF PROFESSIONAL CONDUCT FOR OHIO EDUCATORS OVER OBJECTIONS BY THE DEFENSE.

THE TRIAL COURT ERRED IN OVERRULING THE MOTION FOR A NEW TRIAL.

{¶ 47}   Both of these assignments of error are predicated upon Cox's argument that the trial court should not have allowed the State to refer to the Licensure Code of Professional Conduct for Ohio Educators during her cross-examination, because the State had not disclosed the Code in discovery, but only brought it to the attention of Cox and the trial court after a recess taken between Cox's direct and cross-examination testimony.   The State explained that the Code had not been brought to the State's attention, by a "bystander," until that recess.   Cox did not dispute this explanation for the State's failure to have previously disclosed its intention to refer to the document.   That part of Cox's motion for a new trial directed to the State's use of the Licensure Code of Conduct in Cox's cross-examination also argued unfair surprise.

{¶ 48}   The trial court overruled Cox's objection, allowing the State to use the Code for impeachment purposes, but not allowing its admission in evidence:

> THE COURT: All right.   It's the view of the Court that even though these documents were not given in discovery because they weren't aware of – the State was not aware of them, I see no reason that based upon the Defendant's testimony and the questions propounded to the Defendant that these cannot be used for purposes of impeachment only in cross-examination.   They can be marked as an exhibit, whether I introduce them into evidence or not, it's another question.   It

will come at a later time. I may not do that, I don't know, depending upon how the testimony goes.

But for purposes of impeachment, I recall specific questions being asked and responses made by the Defendant regarding contracts that she had obligations under to certain students. I recall at least the one – answer of her [sic] indicating that she was involved in the negotiation of certain contracts, evidently, with the union and the Board of Education, as the case may be.

So I think that they would be appropriate for purposes of impeachment in cross-examination. I will allow the State to utilize them for that purpose and that purpose only.

MS. OLIVER [representing the State]: Thank you, Your Honor.

THE COURT: I'm more than happy to give you some time to look at the things. I would prefer, I think, perhaps, to do that before you start any redirect. In other words, I want to keep going – or how much time do you think you need to look at this? One of those documents is about an inch-and-a-half thick.

MR. WILLIAMSON [representing Cox]: I believe the Prosecutor has indicated she's only referring to excerpts, not the entire 300-page document but –

THE COURT: Well, why don't we see what she questions on in her cross-examination? And then before redirect, if you think you need some time to look at the specific areas of the contracts that she has cross-examined on, I'll give you some time to look at them before you do any redirect.

MR. WILLIAMSON: I appreciate any time at all. I would prefer to have

the time before my client gets on the stand to be able to see this.

THE COURT: Can you point out to him, quickly, what you plan – what areas you plan to utilize, counsel?

MS. OLIVER: Yes.

THE COURT: And give him an opportunity to – so we'll take a few minutes here then to do that.

{¶ 49}   When the proceedings resumed after Cox's attorney had had a chance to review the documents, the record reflected that two documents were involved.  The larger of these was "the master contract with the Dayton Public School System"; the smaller was the Licensure Code of Professional Conduct for Ohio Educators, apparently published by the Ohio Department of Education.  Cox then renewed her objection to the use of the Code, arguing that it had not been incorporated in the contract.  The State argued that the Code was incorporated in the contract.

{¶ 50}   During cross-examination, Cox agreed that the master contract, to which she was subject, included a requirement of adherence to the ethical standards of her licensure.  She was then shown a portion of the Code of Conduct that indicates that engaging in an altercation with a student is deemed to be unbecoming of a teacher, an unremarkable conclusion.

{¶ 51}   The significance of this line of questioning is limited.  The issue for the jury was not whether Cox had committed conduct unbecoming of a teacher, but whether she had assaulted a student to whom she had assumed a duty of care and protection.  Cox did not object to this line of questioning on relevance grounds.

{¶ 52}   We conclude that the trial court did not abuse its discretion in permitting the State to refer to the Licensure Code of Conduct during its cross-examination of Cox.  The

original basis for Cox's objection was that the State's intention to use the Code had not been disclosed to Cox during discovery. The trial court reasonably concluded that the State had not committed a discovery violation, because it disclosed the Code as soon as it became aware of it. The trial court also allowed Cox's counsel some time to familiarize himself with the parts of the Code to which the State intended to refer.

{¶ 53} Cox then renewed her objection, arguing that the Code of Conduct was not incorporated into Cox's teaching contract. But as the State's line of questioning showed, the contract did refer to the Code of Conduct, and Cox admitted that the contract required adherence to the ethical requirements in the Code.

{¶ 54} Although we question the relevance of the Code of Conduct to the factual issue before the jury, Cox never objected on the basis of relevance. We conclude that even if the unfair prejudicial impact of this line of questioning outweighed its probative value, the impact on the trial was negligible, so that the admission of the testimony was not plain error. Far more damaging to Cox on the duty-of-care issue was her previous admission that she had at least some duties of care and protection to students who were not assigned to her for instructional purposes, and that she would have had a duty of care and protection to a student with disabilities with whom she had voluntarily interacted.

{¶ 55} Cox's Fourth and Fifth Assignments of Error are overruled.

## VII. Conclusion

{¶ 56} All of Cox's assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

FROELICH, P.J., and WELBAUM, J., concur.


Copies mailed to:

Mathias H. Heck
Kirsten A. Brandt
Anthony S. Vannoy
Robert Alan Brenner
Hon. Frances E. McGee